UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEROME RATLIFF, JR., individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | 17 C 7214 |
| Plaintiff, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| VENTURE EXPRESS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

Jerome Ratliff, Jr. brings this putative class action against Venture Express, Inc., alleging that it violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 *et seq*., by failing to provide him with certain disclosures after rejecting his job application due at least in part to negative information it received about him in a background report. Doc. 44. Venture moved to dismiss under Civil Rule 12(b)(1) for lack of Article III standing and under Civil Rule 12(b)(2) for lack of personal jurisdiction, or alternatively for transfer under 28 U.S.C. § 1404(a) to the Middle District of Tennessee. Doc. 18. While that motion was pending, the Seventh Circuit heard argument in *Robertson v. Allied Solutions, LLC*, 902 F.3d 690 (7th Cir. 2018), which presented an FCRA standing issue akin to the one here. The court stayed this case pending the Seventh Circuit's decision in *Robertson* and denied the motion to dismiss or transfer without prejudice to renewal when the case resumed. Doc. 31. The court lifted the stay after *Robertson* was decided and allowed Ratliff to file an amended complaint. Docs. 38, 43-44. Venture now renews its motion to dismiss under Rules 12(b)(1) and 12(b)(2) or to transfer under § 1404(a). Doc. 45. The motion is denied.

**Background**

In resolving a Rule 12(b)(1) motion asserting a facial challenge to subject matter jurisdiction, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Ratliff's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). In resolving a Rule 12(b)(2) motion, the court considers the complaint's well-pleaded factual allegations and the evidentiary materials submitted by both sides. *See Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012). No party has requested an evidentiary hearing, so the court must "accept as true all well-pleaded facts alleged in the complaint and resolve any factual disputes … in favor of" Ratliff. *Ibid.*; *see also Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). In addressing a motion to transfer under 28 U.S.C. § 1404(a), the court again accepts the complaint's well-pleaded factual allegations, as supplemented by the parties' evidentiary materials, and draws all reasonable inferences in Ratliff's favor. *See Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809-10 (7th Cir. 2011); *Carter v. Baldwin*, 2017 WL 3310976, at *1 (N.D. Ill. Aug. 3, 2017). The facts are set forth as favorably to Ratliff as the relevant materials permit. *See GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009). In setting forth the facts at this stage, the court does not vouch for their "objective truth." *Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

Ratliff, an Illinois resident, applied online for employment as a commercial truck driver in response to a solicitation from Venture. Doc. 24-1 at ¶¶ 2-3; Doc. 44 at ¶ 21. Ratliff viewed the solicitation; submitted the application, which set forth his Illinois address; and electronically signed disclosure and consent forms—all while in Illinois. Doc. 24-1 at ¶¶ 3-5, 7.

Venture is a trucking and transportation company incorporated and headquartered in Tennessee. Doc. 44 at ¶¶ 1, 8. It conducts business throughout the United States, including in Illinois; employs more than 900 drivers; and operates more than 750 trucks and 3,000 trailers. *Id*. at ¶ 8. Venture's corporate officers and human resources employees work out of its Tennessee headquarters. Doc. 18-1 at ¶ 3. Venture makes employment and personnel decisions in Tennessee, recruits and communicates with job applicants from Tennessee, and does not have any offices in Illinois. *Id*. at ¶¶ 4, 6.

Venture operates a website through which prospective employees can apply for positions as drivers. Doc. 44 at ¶ 2. From October 1, 2012 through September 30, 2017, Venture received 11,638 online applications, of which thirty listed Illinois addresses. Doc. 25-2 at ¶ 3. As part of its hiring process, Venture obtains background reports from HireRight, LLC, a firm located in California. Doc. 18-1 at ¶ 9; Doc. 44 at ¶ 2. Each report provides the applicant's name, social security number, date of birth, past employers, work records, reasons for leaving past employers, rehire eligibility, drug and alcohol history, truck driving school performance records, and trucking accident or incident history. Doc. 44 at ¶ 18. Venture uses the reports in deciding whether to continue the hiring process. *Id*. at ¶ 2. Venture communicates with HireRight from Tennessee. Doc. 18-1 at ¶ 5.

The day after Ratliff applied, Venture obtained his background report from HireRight. Doc. 44 at ¶ 22. The report referenced a "Preventable Accident/Incident" involving Ratliff that

occurred on September 5, 2014 in South Dakota. *Id*. at ¶ 24. This aspect of the report was inaccurate or incomplete in that it failed to indicate that the citation issued to Ratliff arising from the incident had been dismissed. *Id*. at ¶¶ 23, 25-26.

Based in part on the HireRight report, Venture disqualified Ratliff from further consideration. *Id*. at ¶ 28. Ratliff never received any oral, written, or electronic notification from Venture that it would not offer him a job—much less notice that its decision was based in part on the HireRight report or that the FCRA gave him the right to obtain the report and dispute its accuracy or completeness with HireRight. *Id*. at ¶¶ 30-32. This deprived Ratliff of the ability to contact HireRight to correct the report, which had the effect of "denying him fair access to employment." *Id*. at ¶ 36; *see also id*. at ¶ 53 (alleging that Ratliff suffered the harm of "unfairly being denied access to employment"). Ratliff did not learn about Venture's use of the report until October 2015, when he discovered it through his own investigation. *Id*. at ¶ 22.

### Discussion

Ratliff alleges that Venture violated the FCRA by failing to notify him that it rejected his application based in part on the HireRight report and to provide HireRight's contact information and a summary of his FCRA rights—including the right to obtain a free copy of the report and dispute its accuracy or completeness with HireRight—as required by 15 U.S.C. § 1681b(b)(3)(B). Doc. 44 at ¶¶ 44-54. That provision, which applies to online applications for truck driving and certain other transportation-related positions, requires those notification and disclosures when an employer "who has procured a consumer report on [a] consumer for employment purposes takes adverse action on the [consumer's] employment application based in whole or in part on the report." 15 U.S.C. § 1681b(b)(3)(B)(i), (C). The statute's references to a "consumer" and a "consumer report" may appear an uneasy fit for background reports procured

by prospective employers, but under the FCRA, a background report prepared for "employment purposes" is a "consumer report," *id*. § 1681a(d)(1) (defining "consumer report" to include "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's … character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for … employment purposes"), a job applicant is a "consumer," *id*. § 1681a(c) ("The term 'consumer' means an individual."), and a firm that "for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating … information on consumers for the purpose of furnishing consumer reports to third parties" and "uses any means or facility of interstate commerce" for that purpose is a "consumer reporting agency," *id*. § 1681a(f).

## I.      Article III Standing

Venture argues that Ratliff does not allege a concrete injury and thus lacks Article III standing.  Doc. 46 at 4-6.  "[T]he irreducible constitutional minimum of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citation and internal quotation marks omitted).  "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical."  *Id*. at 1548 (internal quotation marks omitted).

Whatever injury Ratliff suffered was caused by Venture's alleged failure to provide him with the information the FCRA required it to provide, and a favorable judicial decision could redress his injury through an award of actual or statutory damages under the FCRA.  *See* 15 U.S.C. § 1681n(a)(1)(A) ("Any person who willfully fails to comply with [the FCRA] … with

respect to any consumer is liable to that consumer in an amount equal to the sum of … any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000 … ."). And because the obligation Venture failed to fulfill was to send information specifically to Ratliff, his injury was "particularized," as Venture's omission "affect[ed] [him] in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (internal quotation marks omitted). So the dispositive question here, as Venture recognizes, is whether Ratliff's alleged injury is concrete. *See id*. at 1550 (holding that concreteness and particularity must be separately considered).

To be concrete, a plaintiff's injury "must be *de facto*; that is, it must actually exist." *Id*. at 1548 (internal quotation marks omitted). In other words, the injury must be "real," not "abstract." *Ibid*. Both "tangible" and "intangible" injuries, even those that are "difficult to prove or measure," can suffice. *Id*. at 1549. But concreteness requires at least some "appreciable risk of harm" to the plaintiff. *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 727 (7th Cir. 2016); *see also Spokeo*, 136 S. Ct. at 1550 (holding that an alleged injury is not concrete where the complained-of conduct does not "cause harm or present any material risk of harm"); *Gubala v. Time Warner Cable, Inc.*, 846 F.3d 909, 911 (7th Cir. 2017) (holding that the plaintiff lacked standing where he identified no "plausible (even if attenuated) risk of harm to himself").

When attempting to determine whether an alleged injury suffices under Article III, Congress's judgment is an "instructive and important" source of guidance. *Spokeo*, 136 S. Ct. at 1549. Congress is "well positioned to identify intangible harms that meet minimum Article III requirements" and, through legislation, may "define" and thus render "legally cognizable" injuries that were once obscure. *Ibid*. (internal quotation marks omitted); *see also Massachusetts v. EPA*, 549 U.S. 497, 516 (2007) ("Congress has the power to define injuries and

articulate chains of causation that will give rise to a case or controversy where none existed before.") (internal quotation marks omitted). The Supreme Court has cautioned, however, that "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549. So, although courts must give appropriate regard to Congress's judgment, they also must remain vigilant to distinguish statutory injuries that "actually exist" from "bare procedural violation[s]" that are "divorced from any concrete harm." *Id*. at 1548-49.

Of relevance here, and as the Seventh Circuit explained in *Robertson v. Allied Solutions*, *supra*, a defendant's "withholding information when a statute requires its publication" inflicts an "informational injury" on the plaintiff. 902 F.3d at 694. "An informational injury is concrete if the plaintiff establishes that concealing information impaired her ability to use it for a substantive purpose that the statute envisioned." *Ibid*. That is precisely what Ratliff has done here.

"The FCRA regulates the use of materials such as the[] background reports" Venture obtained from HireRight, and it does so in part to combat "the problem of inaccurate reports." *Id*. at 695-96. When Congress in 1996 enacted § 1681b(b), the provision applied generally to any employer using a background report "for employment purposes." Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208, § 2403(b), 110 Stat. 3009, 3009-430 to -431 (codified as amended at 15 U.S.C. § 1681b(b)). In 1998, Congress amended the statute to impose different requirements on employers using background reports "in connection with" employment applications submitted "by … computer" for truck driving positions and certain other transportation-related jobs. *See* Consumer Reporting Employment Clarification Act of 1998, Pub. L. No. 105-347, § 2(b), 112 Stat. 3208, 3209-10 (codified as amended at 15 U.S.C.

§ 1681b(b)(3)); *Robertson*, 902 F.3d at 695-96.  The parties agree that because Ratliff applied

online for a truck driver job, the modified requirements enacted in 1998—which are codified in

§ 1681b(b)(3)(B) ("Subparagraph (B)")—apply instead of the standard requirements enacted in

1996—which are codified in § 1681b(b)(3)(A) ("Subparagraph (A)").  Doc. 44 at ¶¶ 21, 51;

Doc. 46 at 5-6.  For simplicity's sake, the court will sacrifice some precision by referring to the

Subparagraph (B) requirements as applying to "trucking companies."

Subparagraph (A) sets out this procedure for covered employers (*i.e.*, employers other

than trucking companies) considering an adverse employment action based at least in part on a

background report:

> Except as provided in subparagraph (B), in using a consumer report for
> employment purposes, before taking any adverse action based in whole or in
> part on the report, the [employer] intending to take such adverse action shall
> provide to the consumer to whom the report relates … (i) a copy of the report;
> and (ii) a description in writing of the rights of the consumer under [the
> FCRA] … .

15 U.S.C. § 1681b(b)(3)(A).  Subparagraph (B) sets out this different procedure for trucking

companies that deny a remotely submitted job application based at least in part on a background

check:

> If a consumer [applying for a covered transportation industry position] applies
> for employment by mail, telephone, computer, or other similar means, and if
> a[n employer] who has procured a consumer report on the consumer for
> employment purposes takes adverse action on the employment application
> based in whole or in part on the report, then the [employer] must provide to
> the consumer to whom the report relates, in lieu of the notices required under
> subparagraph (A) … , within 3 business days of taking such action, an oral,
> written or electronic notification—
>
> (I) that adverse action has been taken based in whole or in part on a
> consumer report received from a consumer reporting agency;
>
> (II) of the name, address and telephone number of the consumer reporting
> agency that furnished the consumer report …; [and]
>
> …

> (IV) that the consumer may, upon providing proper identification, request a free copy of a report and may dispute with the consumer reporting agency the accuracy or completeness of any information in a report.

*Id*. § 1681b(b)(3)(B)(i). If an applicant covered by Subparagraph (B) requests a copy of the background report from the trucking company, then the company must, "within 3 business days of receiving the consumer's request, … send or provide to the [applicant] a copy of a report and a copy of the" applicant's FCRA rights. *Id*. § 1681b(b)(3)(B)(ii).

The obligations imposed by Subparagraph (B) differ in two material respects from those imposed by Subparagraph (A). First, rather than providing notice of an impending adverse action *before* taking it, the trucking company may wait until three business days *after* taking the action. *See Robertson*, 902 F.3d at 695-96. Second, the trucking company must provide the same information employers covered by Subparagraph (A)—a copy of the report and a summary of the applicant's FCRA rights—only if the applicant requests the report from the company. *See* 15 U.S.C. § 1681b(b)(3)(A), (B)(ii).

The Seventh Circuit held in *Robertson* that the plaintiff there suffered a concrete injury and had Article III standing to pursue her claim under Subparagraph (A) that the defendant revoked a job offer "based on her background check without first supplying a copy of the report or a written summary of her FCRA rights." 902 F.3d at 693, 697. The key question here is whether the distinctions between Subparagraphs (A) and (B) yield a different result for disappointed applicants deprived of the information required by Subparagraph (B)—that is, as *Robertson* puts it, whether a prospective employer's failing to provide the information required by Subparagraph (B) "impair[s] [the applicant's] ability to use it for a substantive purpose that the statute envisioned," resulting in a concrete injury. *Id*. at 694; *see also Rivera v. Allstate Ins. Co.*, 913 F.3d 603, 615 (7th Cir. 2019) ("[S]tanding questions in cases of this type [under the

FCRA] sometimes require us to identify the particular interest Congress sought to protect and to determine if the plaintiff has suffered a concrete injury to that interest.").

Before proceeding, it bears mention that *Robertson* identifies a distinction between Subparagraphs (A) and (B) that is immaterial here. The plaintiff in *Robertson* did not allege that her background report was inaccurate or incomplete, so her injury was being deprived of the "broad opportunity to respond" to her prospective employer contemplated by Subparagraph (A). 902 F.3d at 694-96. In explaining why it read Subparagraph (A) to serve that interest, *Robertson* distinguished Subparagraph (B) as "explicitly limit[ing] the range of disputes to 'accuracy or completeness.'" *Id*. at 696 (quoting 15 U.S.C. § 1681b(b)(3)(B)(i)(IV)). This characterization of the interests protected by Subparagraph (B) is significant. Ratliff's alleged injury is not that he was deprived of a "broad opportunity to respond" to Venture regarding the HireRight report. Rather, Ratliff alleges that he wanted to dispute the inaccurate and incomplete aspects of the report, Doc. 44 at ¶¶ 23-27, which means that his informational injury—not knowing that the report resulted in his Venture application being denied, and being deprived of the opportunity to obtain a copy of the report so that he could dispute it with HireRight and thereby correct the inaccuracy on a going-forward basis—fits precisely within the narrower range of interests that, according to *Robertson*, Subparagraph (B) protects.

Another distinction between Subparagraphs (A) and (B), timing, presents a more complicated question. As noted, Subparagraph (B) requires the employer to provide notice within three business days after taking an adverse action based at least in part on a background report, while Subparagraph (A) requires the employer to provide notice before taking such action. It is open to question whether, for purposes of allowing an applicant to respond to a prospective employer's concerns, there is any material difference between receiving notice three

business days after an adverse action (Subparagraph (B)) and receiving notice between the time

the employer forms the intent to take an adverse action and the time it follows through

(Subparagraph (A)).  After all, both before and three business days after the adverse action, the

applicant is effectively in the same position: He has not been hired, and he faces an uphill battle

to convince an employer who either has decided (Subparagraph (B)) or has all but decided

(Subparagraph (A)) against hiring him to reconsider its decision.  *See Robertson*, 902 F.3d at 697

(describing Subparagraph (A) as protecting the chance to "convince an employer to *revisit* its

decision") (emphasis added).

There is no need to run that issue to ground, for even if receiving an adverse action notice

three days after an application is rejected eliminates the applicant's "substantive interest" in the

opportunity to "review the reason for any adverse decision and to respond" to the employer, *id*.

at 696, the three-day delay does not eliminate a separate substantive interest served by

Subparagraph (B): correcting inaccurate and incomplete reports that may damage the applicant's

*future* employment applications and prospects.  As noted, Subparagraph (B) requires the

employer to provide the rejected applicant with the "name, address and telephone number" of the

firm that prepared the report and to inform him that he "may dispute with th[at firm] the

accuracy or completeness of any information in [the] report."  15 U.S.C. § 1681b(b)(3)(B)(i)(II),

(IV).  Armed with the knowledge that a background report has damaged and (importantly) may

continue to damage his employment prospects, the applicant can obtain the report and correct the

record so that the same inaccurate or incomplete information will not harm his chances on future

applications.  By failing to tell the applicant that the report led it to deny his application and

inform him which firm prepared it and that he has the right to dispute its accuracy or

completeness with that firm, the employer "impair[s] [his] ability to use" that information to stop

the report from causing further damage, *Robertson*, 902 F.3d at 694, and thus does injury to a "particular interest Congress sought to protect" through Subparagraph (B), *Rivera*, 913 F.3d at 615. It follows that the timing of the notice required by Subparagraph (B) does not eliminate the concreteness of the injury imposed on an applicant who is deprived of that notice, and thus does not defeat Article III standing.

Nor does the distinction between Subparagraphs (A) and (B) in how the requirement to provide a copy of the report is triggered—automatically under Subparagraph (A), but only upon the applicant's request under Subparagraph (B)—defeat the concreteness of the injury attending a Subparagraph (B) violation. Venture argues that Ratliff "is entitled to no substantive information at all," Doc. 52 at 4, invoking *Rivera*'s emphasis on the fact that while the provision at issue there, § 1681a(y)(2), required only a "summary" of the report (which "need not be in writing" and "may be quite generalized"), Subparagraph (A) requires "a *complete copy* of the consumer report." 913 F.3d at 616-17. But had Venture complied with its Subparagraph (B) obligation to notify Ratliff that it had relied in part on the HireRight report in denying his application, Ratliff could have asked for a copy, at which point Venture would have had to promptly provide the same information required by Subparagraph (A). *See* 15 U.S.C. § 1681b(b)(3)(A), (B)(ii).

In sum, because Ratliff alleges that the HireRight report is inaccurate and incomplete, Venture's failure to disclose that it took adverse action at least in part due to the report "impaired [his] ability to use [that information] for a substantive purpose that [Subparagraph (B)] envisioned," making concrete his informational injury. *Robertson*, 902 F.3d at 694. The motion to dismiss for lack of Article III standing is therefore denied.

## II.     Personal Jurisdiction

Venture next argues that it is not subject to personal jurisdiction in Illinois.  A plaintiff "has the burden of proving personal jurisdiction."  *John Crane, Inc. v. Shein Law Ctr., Ltd.*, 891 F.3d 692, 695 (7th Cir. 2018).  "[W]here, as here, there has been no [evidentiary] hearing on the matter," a plaintiff need only make "a prima facie showing of jurisdiction."  *Ibid*.

"In a federal question case such as this one, a federal court has personal jurisdiction over the defendant if either federal law or the law of the state in which the court sits authorizes service of process to that defendant."  *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex*, 623 F.3d 440, 443 (7th Cir. 2010).  Because the FCRA "does not have a special federal rule for personal jurisdiction," the court must "look to the law of the forum for the governing rule."  *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014); *see also KM Enters. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 723 (7th Cir. 2013) (describing "the mechanics for asserting personal jurisdiction in federal court" under Civil Rule 4(k)); *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1265 (11th Cir. 1998) (noting that the FCRA does not authorize nationwide service of process).  "The Illinois long-arm statute permits the court to exercise jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment."  *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing 735 ILCS 5/2-209(c)).  Accordingly, this court must determine "whether the exercise of personal jurisdiction [over Venture] would violate federal due process."  *Mobile Anesthesiologists*, 623 F.3d at 443.

"Under the Supreme Court's well-established interpretation of the Fourteenth Amendment's due process clause, a defendant is subject to personal jurisdiction in a particular state only if the defendant had certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Ibid*. (internal

quotation marks omitted). The Court has "framed the constitutional inquiry in terms of whether the defendant purposefully avails itself of the benefits and protections of conducting activities in the forum state." *Id*. at 444 (internal quotation marks omitted). For a defendant to be subject to personal jurisdiction, its "contacts must not be merely random, fortuitous, or attenuated; rather, the 'defendant's conduct and connection with the forum State' must be such that it should 'reasonably anticipate being haled into court there.'" *Citadel Grp. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "Personal jurisdiction can be general or specific, depending on the extent of the defendant's contacts." *Mobile Anesthesiologists*, 623 F.3d at 444; *see also Daimler AG v. Bauman*, 571 U.S. 117, 126-28 (2014). Only specific jurisdiction need be considered here, as Ratliff does not contend that Venture is subject to general jurisdiction in Illinois. Doc. 24 at 7.

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (citations and internal quotation marks omitted). When assessing specific jurisdiction, the "relevant contacts" arise from "the defendant's *suit-related* conduct," which "must create a substantial connection with the forum State." *Advanced Tactical*, 751 F.3d at 801 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). "The mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction. Furthermore, the relation between the defendant and the forum must arise out of contacts that the defendant *himself* creates with the forum." *Ibid*. (alteration, citation, and internal quotation

14

marks omitted). In other words, "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 802. Whether the exercise of specific jurisdiction comports with due process turns on the particular facts of the case. *See uBID, Inc. v. GoDaddy Grp.*, 623 F.3d 421, 433 (7th Cir. 2010) ("[T]his is a field of law where the Supreme Court has repeatedly refused opportunities to draw … bright lines.").

Venture purposefully availed itself of the privilege of conducting business in Illinois by setting up a website through which Illinois residents could submit job applications; receiving Ratliff's application through the website; seeking and obtaining his signature on consent and disclosure forms, one of which presumably authorized it to obtain his background report, *see* 15 U.S.C. § 1681b(b)(2)(B)(ii); moving forward with the hiring process by obtaining the HireRight report; and ultimately deciding not to hire him based in part on that report, thus triggering an obligation under the FCRA to notify him that it had not hired him based on the report and that he had rights under the FCRA to obtain a copy of the report and dispute its accuracy and completeness with HireRight. This suit arises directly out of Venture's alleged failure to fulfill its obligation to send those notifications to an Illinois resident in Illinois. It follows that Venture is subject to specific jurisdiction in Illinois. *See Illinois v. Hemi Grp.*, 622 F.3d 754, 759 (7th Cir. 2010) (holding that the plaintiff's claims arose out of the defendant's contacts with Illinois because the defendant "sold and shipped cigarettes to Illinois residents, and [its] actions surrounding those sales triggered [the plaintiff's] claims against it").

As Venture observes, Illinois comes into the picture only because Ratliff resides in and applied from Illinois. Doc. 45 at 8. But it does not follow that Venture's contacts with Illinois were "merely the unilateral activity of [an] Illinois resident[]" insufficient to create specific jurisdiction. *uBID*, 623 F.3d at 428-29 (internal quotation marks omitted) (rejecting the

defendant's argument that its sales of domain names to Illinois residents resulted from the buyers' unilateral activity given that the transactions were submitted online and "processed automatically by [the defendant's] servers in Arizona," reasoning that the defendant "itself set the system up this way"). Reaching that conclusion would require the court to "ignore[] several of [Venture's] own actions that led up to and followed" Ratliff's application. *Hemi*, 622 F.3d at 758. Venture set up its website such that it "stood ready and willing to [accept applications from] Illinois residents," thus "reaching out to residents of Illinois." *Ibid*. More importantly, after Ratliff "reach[ed] back" by submitting an application indicating that he was in Illinois, Venture deepened the relationship by obtaining his consent to acquire a background report, acquiring the report, and deciding not to hire him in part because of the report, thus giving rise to a legal obligation to send him certain information in Illinois. *See id*. at 755-56, 758 (holding, in a suit alleging that the defendant's cigarette sales violated federal reporting requirements and state restrictions on such sales, that the defendant was subject to personal jurisdiction in Illinois because it created a website through which customers could purchase cigarettes, received an order from an Illinois resident, and fulfilled the order by shipping the goods to Illinois).

Venture retorts that it is not subject to personal jurisdiction because Ratliff's "claim has nothing to do with anything [it] transported into Illinois." Doc. 25 at 3. That argument is too clever by half. Ratliff's claim is that Venture, having interacted with him during the hiring process in a way that triggered an obligation to send information to him in Illinois, failed to send that information. Contrary to Venture's submission, it does not matter for personal jurisdiction purposes whether a defendant breached a legal obligation (1) in connection with a thing it sent to the forum State or (2) by failing to send that thing to the forum State. After all, if a vendor in State A contracts with a customer in State B to deliver goods to State B, the vendor is subject to

personal jurisdiction in State B if it sends defective goods *or* if it fails to send goods at all. *See Burger King*, 471 U.S. at 463-64, 478-79 (noting, in a case involving a Michigan defendant's alleged failure to make contractually required payments in Florida, that although merely contracting with a Florida resident does not establish personal jurisdiction there, the "terms of the contract" and its "contemplated future consequences" may do so); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287-88, 297-98 (1980) (suggesting that a car dealer would be subject to personal jurisdiction in a products liability suit if it sold an allegedly defective vehicle directly to a customer in the forum State); *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 221-23 (1957) (holding that a Texas insurance company was subject to personal jurisdiction in California in a suit alleging that it improperly denied a life insurance claim, where the "contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died"); *Biltmoor Moving & Storage Co. v. Shell Oil Co.*, 606 F.2d 202, 207 (7th Cir. 1979) (holding that the defendant was subject to personal jurisdiction in Illinois in a suit arising out of a contract that required it to perform services in Illinois); *N. Penn Gas Co. v. Corning Nat. Gas Corp.*, 897 F.2d 687, 689-90 (3d Cir. 1990) (holding that a New York firm was subject to personal jurisdiction in Pennsylvania in a breach of contract suit alleging that it failed to make payments for space it reserved in the plaintiff's natural gas storage fields in Pennsylvania, even though it never stored gas there). That Venture's alleged legal obligation arises from a statute rather than a contract is likewise irrelevant. *See Hemi*, 622 F.3d at 755-56 (holding that the out-of-state defendant was subject to personal jurisdiction in Illinois on claims that its conduct violated state and federal statutes).

Venture also contends that because it "made no effort to 'target' Illinois" and instead opened its online application to "anyone in any state," it is not subject to personal jurisdiction in

Illinois.  Doc. 45 at 11.  Accepting that argument would lead to the absurd result that an employer that hires from a handful of States, or even 49 States, is amenable to suit in each of those States, but that an employer that hires nationally is amenable to suit only in its home State(s).  *Cf. Hemi*, 622 F.3d at 760 ("Hemi wants to have its cake and eat it, too: it wants the benefit of a nationwide business model with none of the exposure.").  By choosing to cast a wide net for applicants, Venture opened itself up to the risk of being sued away from home for alleged misconduct in the hiring process.  Even if the Illinois job market was "simply one among many, a place of no particular interest to it," Venture "purposefully availed itself" of that market when it actively engaged in the hiring process with, and obtained a background report for, an applicant it knew was in Illinois.  *uBID*, 623 F.3d at 428-29.

To support its targeting argument, Venture cites *be2 LLC v. Ivanov*, 642 F.3d 555 (7th Cir. 2011), which held that "simply operating an interactive website that is accessible from the forum state" is not enough for personal jurisdiction and that "a defendant must in some way *target* the forum state's market."  *Id*. at 558-59.  But *be2 LLC*'s targeting analysis "boil[ed] down to" the question whether the defendant there "purposely exploited the Illinois market," not (as Venture would have it) to whether the defendant focused on Illinois more than on other States.  *Ibid*.  In any event, Venture went well beyond "merely operat[ing] a website," *id*. at 559, when it engaged in the hiring process with an applicant from Illinois in a way that triggered an FCRA obligation to send information to that applicant.  *Cf. Felland*, 682 F.3d at 676 & n.3 (holding that emails sent "to Wisconsin residents knowing that they would most likely be read and have their effect in Wisconsin" were, like "mailed letters or telephone calls," "properly considered as contributing to [the defendant's] minimum contacts with the forum state").

Accordingly, Venture's suit-related contacts with Illinois are sufficient to support personal jurisdiction. Venture does not argue that exercising personal jurisdiction over it would offend "traditional notions of fair play and substantial justice," *N. Grain Mktg.*, 743 F.3d at 492, thus forfeiting the issue. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court."); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("We apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue … ."). Even setting aside forfeiture, any such argument would fail on the merits.

The factors relevant to the fair play and substantial justice inquiry are "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Felland*, 682 F.3d at 677 (quoting *Burger King*, 471 U.S. at 477). "[A]s is almost always the case," Illinois "has a strong interest in providing a forum for its residents to seek redress for [harms] inflicted by out-of-state actors and injuries suffered within the state." *Ibid*. Although Venture would "face some burden in being forced to defend an action in" Illinois rather than Tennessee, "out-of-state defendants *always* face such a burden, and there is no suggestion that [Venture's] hardship would be any greater than that routinely tolerated by courts exercising specific jurisdiction against nonresidents." *Ibid*. Finally, "[t]here is no compelling reason to assume" either that a suit in Illinois would not serve Ratliff's interest in obtaining convenient and effective relief or that it would not be the most efficient way to resolve the matter. *Ibid*.; *see also Hemi*, 622 F.3d at 760 (holding that "[t]here is nothing constitutionally unfair about allowing Illinois" to exercise personal jurisdiction where

19

the defendant had "held itself out to conduct business nationwide and was apparently successful in reaching customers across the country"). Given all this, exercising personal jurisdiction over Venture would not offend traditional notions of fair play and substantial justice.

### III.    Section 1404(a) Transfer

Venture argues in the alternative under 28 U.S.C. § 1404(a) that the court should transfer this case to the Middle District of Tennessee. Doc. 45 at 12-15. Section 1404(a) states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought … ." 28 U.S.C. § 1404(a). Transfer "is appropriate if: (1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interest of justice." *Law Bulletin Publ'g Co. v. LRP Publ'ns, Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998); *see also Atl. Marine Constr. Co. v. U.S. Dist. Court*, 571 U.S. 49, 62 (2013) ("In the typical case … , a district court considering a § 1404(a) motion … must evaluate both the convenience of the parties and various public-interest considerations."); *Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010) ("The statutory language … is broad enough to allow the court to take into account all factors relevant to convenience and/or the interests of justice."). The moving party bears the burden of demonstrating that a transfer is clearly warranted. *See Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989); *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986).

Because Venture is a corporation "subject to the court's personal jurisdiction with respect to [this] action," it is "deemed to reside" in this District for the purpose of establishing venue. 28 U.S.C. § 1391(b)(1), (c)(2). The parties agree that venue is also proper in the Middle District of Tennessee. Doc. 24 at 12. Only convenience of the parties and witnesses and the interest of

justice require further consideration. "The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge." *Coffey*, 796 F.2d at 219.

The convenience factors include: "(1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience [of] the parties." *Law Bulletin Publ'g*, 992 F. Supp. at 1017. The first factor favors the Northern District of Illinois. A plaintiff's choice of forum typically deserves "substantial weight, particularly when it is his home forum." *Baker v. Smith & Wesson Corp.*, 2019 WL 277714, at *3 (N.D. Ill. Jan. 22, 2019). Ratliff chose his home forum for this suit. The weight given to that choice, while substantial, is somewhat diminished because this is a putative class action with thousands of putative class members across the country, only thirty of whom appear to be from Illinois. Doc. 44 at ¶¶ 38-39; Doc. 25-2 at ¶ 3; *see In re Warrick*, 70 F.3d 736, 741 n.7 (2d Cir. 1995) ("[T]he plaintiff's choice of forum is a less significant consideration in a … putative[] class action than in an individual action."); *Sojka v. DirectBuy, Inc.*, 2014 WL 1089072, at *2 (N.D. Ill. Mar. 18, 2014) (collecting cases); 15 Wright & Miller, Federal Practice & Procedure § 3848 (4th ed. 2018) ("[W]here the plaintiff seeks to vindicate rights of others the plaintiff's venue preference is weakened. Thus, courts have held that the factor is entitled to little weight … in class actions.").

The second factor, the situs of material events, is neutral. Venture's alleged actions and omissions occurred in the Middle District of Tennessee, but the resulting injury to Ratliff occurred in this District. *See Sojka*, 2014 WL 1089072, at *2 ("[T]he situs of the material events is not just … where DirectBuy's decisions were made, but also where the calls and texts were received."); *Digan v. Euro-Am. Brands, LLC*, 2010 WL 3385476, at *4 (N.D. Ill. Aug. 19, 2010)

21

(holding that the situs of the material events factor "does not weigh in favor of transfer" to New Jersey where the defendant's adverse employment decisions were made in New Jersey, but the plaintiff felt the effects of those decisions in Illinois) (collecting cases).

The third factor, the ease of access to proof, is neutral. "When documents are easily transferable, access to proof is a neutral factor." *Carter*, 2017 WL 3310976, at *2 (internal quotation marks omitted); *see also Sojka*, 2014 WL 1089072, at *3 (collecting cases). Although there almost certainly are more relevant documents in the Middle District of Tennessee than here, there is no reason to think that in this day and age the documents could not easily be transferred from Tennessee to Illinois. *See Sojka*, 2014 WL 1089072, at *3 ("There is every reason to believe that all relevant documents can easily be transported, electronically or otherwise, to Chicago or Hammond … ."); *see also Carter*, 2017 WL 3310976, at *2 (similar); *Johnson v. United Airlines, Inc.*, 2013 WL 323404, at *5 (N.D. Ill. Jan. 25, 2013) (similar); *Digan*, 2010 WL 3385476, at *5 ("[D]ocuments now are easily scanned, stored, and electronically transmitted, … [and] moving them no longer creates the onerous burden it may once have imposed."). Venture argues that the size of the putative class is 11,638 applicants, making "[c]ombing through each of those applications … a herculean task." Doc. 25 at 10. Maybe so, but the applications were submitted online. Doc. 44 at ¶ 38. How "herculean" or not will be the task of reviewing those electronic documents is a function of their volume, not whether the court hearing this case sits in Chicago or Nashville.

The fourth and fifth factors, the convenience of witnesses and parties, are neutral. "Convenience of non-party witnesses is often the most important factor, as the § 1404 calculus is generally less concerned about the burden that appearing at trial might impose on witnesses who are either employees of parties or paid experts because it is presumed that such witnesses will

appear voluntarily." *Carter*, 2017 WL 3310976, at *3 (citation and internal quotation marks omitted). Neither side has identified any non-party witnesses, Doc. 24 at 14; Doc. 45 at 14, leaving only the convenience of the parties and Venture's employee witnesses, which is a wash. Venture contends that its two employee witnesses, who work in Tennessee, outnumber Ratliff. Doc. 25 at 9-10; Doc. 24-1 at ¶ 2. That argument works mathematically but not legally: "Where the balance of convenience is a close call, merely shifting inconvenience from one party to another is not a sufficient basis for transfer." *Research Automation*, 626 F.3d at 978.

In sum, the convenience factors disfavor transfer and are at best (from Venture's perspective) neutral. The court next evaluates the interest of justice factors. "The 'interest of justice' is a separate element of the transfer analysis that relates to the efficient administration of the court system." *Ibid.* The relevant factors include "docket congestion and likely speed to trial in the transferor and potential transferee forums; each court's relative familiarity with the relevant law; the respective desirability of resolving controversies in each locale; and the relationship of each community to the controversy." *Ibid.* (citations omitted).

The first factor is neutral, as there is only a modest difference in the expected speed of case resolution between the two courts. The median time from filing to disposition is 7.6 months in this District and 11.7 months in the Middle District of Tennessee. United States District Courts—National Judicial Caseload Profile 45, 47 (2018), https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2018.pdf. The median time from filing to trial is 37.8 months in this District and 26.9 months in the Middle District of Tennessee. *Ibid.* This case is likely to proceed at a materially similar pace in either forum.

The second factor, familiarity with the applicable law, is also neutral. Ratliff alleges only an FCRA violation, and this District and the Middle District of Tennessee are equally capable of

interpreting and applying the FCRA, a federal statute. *See AL & PO Corp. v. Am. Healthcare Capital, Inc.*, 2015 WL 738694, at *5 (N.D. Ill. Feb. 19, 2015) ("This case revolves around the requirements of … a federal statute, which both this court and the Central District of California are equally competent to decide.").

The third and fourth factors—the desirability of resolving controversies in each locale, and the relation of each community to the controversy—favor transfer only slightly, if at all. Tennessee has a significant interest in this litigation because Venture's headquarters and human resources employees are located there, and Tennessee is where Venture made the challenged decisions. But Illinois also has an interest in resolving the case. Although it is just one of many States where the putative class members' injuries occurred, there currently is only one plaintiff, and his injury occurred in Illinois. *See ibid.* (holding that the third and fourth factors were neutral where the defendants' "business and majority of employees [were] located in California and the decisions related to the [alleged misconduct] took place there, but [the plaintiff's] injury occurred in Illinois").

In sum, the interest of justice factors are neutral or slightly favor transfer, while the convenience factors slightly disfavor transfer. That state of affairs does not justify transfer, which is appropriate only if the balance of factors "strongly" favors the defendant's proposed forum. *In re Nat'l Presto Indus., Inc.*, 347 F.3d 662, 664 (7th Cir. 2003) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.") (internal quotation marks omitted).

### Conclusion

Venture's motion to dismiss or transfer is denied. It shall answer the operative complaint by March 26, 2019. This opinion does not speak to the merits of Ratliff's FCRA claim or to

whether he would be an adequate class representative under Civil Rule 23(a)(4). Doc. 18-1 at ¶¶ 11-12 (averments from Venture's chief operating officer that Venture emailed Ratliff to request an employment interview *after* it had received the HireRight report, and that after Ratliff did not respond, Venture labeled his application status as "No Response" and took no further action); Doc. 45 at 1 n.1 (listing over a dozen similar FCRA putative class actions filed by Ratliff against other trucking companies).

March 12, 2019

_____
United States District Judge